Michael **MAMAKOS, M.D., Plaintiff,**

v.

**HUNTINGTON HOSPITAL, Thomas I. Longworth, M.D., S. Peter Ravitz, M.D., Howard Ringler, M.D., Lawrence Brickman, M.D., Barry H. Schwibner, M.D., Joseph Farrell, M.D., Alan Kisner, M.D., and E.A. Opstad, Defendants.**

No. 85 CV 1118.

United States District Court, E.D. New York.

Feb. 19, 1987.

Thomas P. Lynch, Lynch, Rowin, Burn-baum & Crystal, Richard J. Carter, Jr., New York City, for Michael S. Mamakos, M.D.

Norton L. Travis, Garfunkel, Wild & Travis, P.C., Great Neck, N.Y., for Huntington Hosp. and E.A. Opstad.

Walter R. Marklein, Heidell, Pittoni & Moran, P.C., New York City, for Thomas I. Longworth, M.D., Lawrence Brickman, M.D.

LeBoeuf, Lamb, Leiby & MacRae (Michael A. Ellenberg and Robert J. Berg, New York City, of counsel), for defendants S. Peter Ravitz, M.D., Howard Ringler, M.D., Barry H. Schwibner, M.D., Joseph Farrell, M.D., and Alan Kisner, M.D.

## MEMORANDUM AND ORDER

McLAUGHLIN, District Judge.

This antitrust action arises from the removal of a physician from a hospital's emergency room on-call roster. Defendants have moved to dismiss the amended complaint for lack of subject-matter jurisdiction and for failure to state a claim upon which relief can be granted.[1] For the reasons stated below, the motion is granted.

### Facts

The jurisdictional facts are not in dispute. Plaintiff is a medical doctor with a specialty in plastic and reconstructive surgery, as are defendants Schwibner, Ravitz and Kisner. Defendant Huntington Hospital ("Hospital") is a non-profit community hospital located in Huntington, New York. Defendant Longworth is the chief of surgery at the Hospital, and defendant Ringler is chairman of the medical board and chief of the department of nuclear medicine. Defendant Brickman specializes in general surgery, and defendant Farrell is an orthopedic surgeon. Defendant Opstad is the executive director of the Hospital.

Plaintiff's troubles began in October 1981, when the Suffolk County Medical Society notified Dr. Longworth that it had received a number of complaints regarding excessive fees charged by Dr. Mamakos. Because the Hospital had received similar complaints, Dr. Longworth brought the matter to the attention of the medical board, which, on July 12, 1982, invited plaintiff to a special meeting to be held on July 16, 1982 to discuss the problem. Plaintiff did not appear on July 16 or at two subsequent meetings he was urged to attend.

Accordingly, at its meeting on September 13, 1982, the medical board took two actions with regard to plaintiff. In view of his failure or refusal to appear at three meetings, it recommended that the board of directors suspend plaintiff's medical staff privileges because of his "behavior disruptive to the operation of the Hospital." The medical board also directed that, in light of plaintiff's failure to attend meetings and respond to complaints about excessive fees, his name be immediately removed from the emergency room on-call schedule.

The emergency room on-call roster is a list of specialists on the Hospital staff. If a patient comes into the emergency room with an injury that the doctor on call regards as requiring plastic surgery, the Hospital will ordinarily contact the plastic surgeon on staff requested by the patient

---

1. To the extent the parties have submitted materials outside the pleadings, the motion is treated as one for summary judgment.

or recommended by the patient's family physician. If neither option is viable in a particular case, the emergency room staff contacts the plastic surgeon on the on-call schedule for that day. That doctor treats the patient in the emergency room and, often, on follow-up visits to the doctor's office.

Plaintiff finally appeared at a meeting of the medical board on October 4, 1982. He indicated that he needed a guide to be used in establishing his fees and that he would, in setting his charges, follow any guidelines suggested. The medical board voted to withdraw its recommendation that plaintiff's staff privileges be revoked, but decided to continue plaintiff's suspension from the emergency room on-call schedule pending establishment of the fee guidelines by an ad hoc committee. After the committee, which included plaintiff, completed its task, plaintiff was restored to the emergency room on-call schedule. He agreed that he would, for a six-month period, provide the Hospital with copies of bills sent to his emergency room patients.

About a year later, however, the Hospital again began to receive complaints about plaintiff's fees for emergency room treatment, and at its January 9, 1984 meeting the medical board again directed that plaintiff be removed from the on-call schedule. This action was upheld at the January 24, 1984 meeting of Hospital board of directors, which asked the medical board to make a recommendation regarding plaintiff's staff privileges.

At its February 6, 1984 meeting, the medical board decided against recommending plaintiff's suspension from the staff. It reasoned that while it was proper to take action to protect emergency room patients, who are traumatized and generally have no opportunity to inquire in advance about fees, the board did not have jurisdiction to interfere with plaintiff's relationship with his private patients, who are able to learn of and agree to the fee prior to the rendering of services. Accordingly, plaintiff remains on the staff of the Hospital, and is still free to perform emergency room plastic surgery when the patient requests him or he receives a referral from another physician. Only his privilege to have his name on the emergency room on-call schedule has been impaired.

Plaintiff sought a hearing pursuant to the Hospital's medical staff by-laws. When his suspension from the on-call roster was upheld after the hearing, plaintiff appealed to the Hospital's review committee, which recommended that the medical board's action be upheld. The board of directors did so on May 14, 1985.

This action was commenced on March 25, 1985.[2] The amended complaint alleges price-fixing and group boycott in violation of section 1 of the Sherman Act, 15 U.S.C. § 1, and monopolization in violation of Sherman Act section 2, 15 U.S.C. § 2. It also alleges pendent state claims of unfair competition and breach of contract. Defendants seek dismissal on the grounds that: 1) the Court lacks subject-matter jurisdiction because the challenged activities do not substantially affect interstate commerce; and 2) the state action doctrine insulates defendants' activity from antitrust attack.

*Discussion*

Jurisdiction under the Sherman Act requires either that the defendant's activity is itself in interstate commerce or that the activity, although local, has an effect on interstate commerce. *McLain v. Real Estate Bd. of New Orleans, Inc.*, 444 U.S. 232, 242, 100 S.Ct. 502, 509, 62 L.Ed.2d 441 (1980). "[M]edical practice *per se* and without more is a local activity. To bring it within reach of the [federal] antitrust laws a substantial and adverse effect upon interstate commerce is requisite." *Marrese v. Interqual, Inc.*, 748 F.2d 373, 380 (7th Cir. 1984) (quoting *Williams v. St. Joseph Hosp.*, 629 F.2d 448, 454 (7th Cir.1980)),

---

**2.** On August 6, 1985, plaintiff filed a complaint against the Hospital with the Public Health Council of the New York State Department of Health. On January 27, 1986, that body ruled that the Hospital had acted properly in removing plaintiff from the on-call list.

*cert. denied,* 472 U.S. 1027, 105 S.Ct. 3501, 87 L.Ed.2d 632 (1985). "[T]he required nexus with interstate commerce," *Seglin v. Esau,* 769 F.2d 1274, 1280 n. 5 (7th Cir. 1985), is not

> established simply by showing that some aspects of a defendant's business have a relationship to interstate commerce. Rather the inquiry must be whether the defendant's activity that has allegedly been "infected" by unlawful conduct can be shown " 'as a matter of practical economics' to have a not insubstantial effect on the interstate commerce involved."

*Furlong v. Long Island College Hosp.,* 710 F.2d 922, 926 (2d Cir.1983) (quoting *McLain, supra,* 444 U.S. at 246, 100 S.Ct. at 511 (quoting *Hospital Building Co. v. Rex Hosp. Trustees,* 425 U.S. 738, 745, 96 S.Ct. 1848, 1852, 48 L.Ed.2d 338 (1976))).

> Thus, to survive a motion to dismiss, the "plaintiff must allege sufficient facts concerning the alleged violation and its likely effect on interstate commerce to support an inference that the defendants' activities infected by illegality either have had or can reasonably be expected to have a not insubstantial effect on commerce."

*Seglin, supra,* 769 F.2d at 1280 (quoting *Furlong, supra,* 710 F.2d at 926).

Plaintiff's complaint sets forth four alleged interstate commerce effects of the violation. First, defendants' activity is alleged to have had an effect on the amounts paid to the Hospital and private physicians by the federal government and insurance companies in interstate commerce (Amended Complaint ¶ 17). Second, it is alleged to have lowered the "billing profiles" used by insurance companies to determine whether a physician's charge for a service is reasonable (Amended Complaint ¶ 18). Third, it is alleged to have had an effect on the Hospital's purchase of supplies from vendors in interstate commerce (Amended Complaint ¶ 19). Finally, it is alleged to have prevented plaintiff from maintaining his national and international reputation in his sub-specialty of hand replantation and microsurgery (Amended Complaint ¶ 20).

Deciding whether these allegations are sufficient to establish that defendants' actions have had a not insubstantial effect on interstate commerce requires the Court to determine the precise nature of the activity in question. The parties disagree as to the proper characterization of the challenged conduct. Defendants argue that the Court should examine the effect on interstate commerce of the removal of plaintiff from the emergency room on-call schedule, whereas plaintiff contends that the relevant focus of inquiry is the alleged horizontal price-fixing scheme.

Having carefully reviewed the complaint, I am constrained to agree with defendants. The gravamen of plaintiff's complaint is his exclusion from the on-call roster. *See Stone v. William Beaumont Hosp.,* 782 F.2d 609, 614 (6th Cir.1986). The events surrounding that action are detailed, followed by the conclusory assertion that horizontal price-fixing, group boycott and monopolization have thus been pleaded. This talismanic invocation of antitrust argot does nothing to cure the amended complaint's failure to set forth facts from which a conspiracy to restrain trade or monopolize might be fairly inferred.

The complaint here is similar to that in *Furlong, supra,* 710 F.2d 922. There an anesthesiologist lost certain privileges when the hospital at which she was on staff granted the exclusive right to provide anesthesiology services to a group to which she did not belong. The Second Circuit, rejecting the district court's view that hospital denials of staff privileges can never affect interstate commerce, noted that price-fixing and group boycotting tend to restrict supply, raise prices and lower output.[3] "Thus, as a matter of substantive antitrust law, there is no defect in a complaint that alleges that a denial of staff privileges, undertaken in furtherance of a price-fixing or group boycotting scheme, may ultimately affect certain of the activi-

---

3. I need not decide whether the Court would have reached a different conclusion if, as here, it was alleged that the price-fixing conspiracy was designed to *lower* prices.

ties that connect a hospital to interstate commerce." *Id.* at 926.

The Court then went on to consider whether plaintiff had adequately alleged such a scheme. It noted that, although she "mention[ed] 'price-fixing' in a caption to her antitrust cause of action, she ha[d] not alleged the classic agreement between competitors that concerned the Court in *McLain.* There [was] no claim that competing hospitals or associations of anesthesiologists ha[d] conspired to fix the prices for their services." *Id.* at 927. In the instant case, too, "the operative language of the complaint ... fails to set forth any facts from which it is inferable that the defendants' activities, infected with the particular illegality alleged, are likely to have a substantial effect on commerce." *Id.*

Similarly, in *Seglin, supra,* 769 F.2d 1274, the court dismissed the complaint of a doctor who had been denied hospital admittance privileges. It noted that he had "set forth no facts, other than a mere conclusory statement, from which it [could] be inferred that [the hospital] ... desire[d] to fix prices or restrain competition." *Id.* at 1280. Because the "complaint boil[ed] down to the single assertion that his ... suspension ... had an effect on defendant's interstate commerce activities ... [it was] insufficient to establish the required [jurisdictional] nexus." *Id.; cf. Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1110 (7th Cir.1984) (" 'When stripped to its essential allegations, the complaint does no more than state plaintiff's ... disappointment at losing ...' " privileges.) (quoting *Dunn & Mavis, Inc. v. Nu-Car Drivaway Inc.,* 691 F.2d 241, 243 (6th Cir.1982)), *cert. denied,* 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985).

Here too the complaint boils down to a claim of improper removal from the on-call list. This action is alleged to have been taken in furtherance of some scheme to violate the antitrust laws, but the alleged conspirators are not identified, the nature of their agreement is not described, and neither the object nor the effect of their enterprise is specified. Accordingly, mindful that "a pleader [is entitled] to enjoy all favorable inferences from facts that have been pleaded [but is] not permit[ted to substitute] conclusory statements for minimally sufficient factual allegations," *Furlong, supra,* 710 F.2d at 927, I now consider whether the *facts* pleaded in plaintiff's complaint are sufficient to establish jurisdiction.

The first alleged effect is on the amounts paid by the government and out-of-state insurers. The complaint fails to describe the manner in which plaintiff's removal from the on-call list might affect those payments; it does not attempt to quantify the effect, nor does it even state whether the amounts have increased or decreased. The mere fact that monies are received from out of state does not establish that the activity "infected by illegality" has any significant effect on interstate commerce. *See Doe On Behalf of Doe v. St. Joseph's Hospital of Ft. Wayne,* 788 F.2d 411, 417 (7th Cir.1986).

The second alleged effect is on billing profiles used by insurance companies to decide whether a physician's charge is reasonable. Defendants' activity is alleged to cause downward pressure on those profiles and hence reduced insurance reimbursement. Not a single fact or figure is set forth to support this allegation. This is not surprising; the removal of a single practitioner from a single service of a single hospital—at which all his other privileges are unimpaired—is unlikely to have any effect on standards set by insurers.

The third alleged effect is on the Hospital's purchase of supplies from out of state vendors. Again there is "no ... adequate claim of an amount of diminished out-of-state purchases that could be evaluated ... against the standard of a 'not insubstantial' effect on commerce," *Furlong, supra,* 710 F.2d at 927 n. 5, and again it is difficult to see how there could be: whether emergency plastic surgery patients are seen by plaintiff or by someone else should not affect the quantity of supplies required for that treatment.

The fourth and final alleged effect is that defendants' actions have prevented plaintiff from treating the types of injuries that will enable him to maintain his national and international reputation in replantation and microsurgery. Again there is no allegation as to how many of these special cases come to plaintiff through the on-call list. That the effect on plaintiff's reputation would be significant is implausible, in light of plaintiff's continued staff and surgery privileges at the Hospital. Because the removal of his name from the on-call roster only affects his treatment of emergency patients who do not request a particular plastic surgeon, plaintiff's ability to treat patients attracted by his reputation is unaffected. In addition, emergency patients are likely to be local; plaintiff's ability to receive referrals from out of state—and, indeed, to treat those patients at Huntington Hospital—is unchanged. In sum, plaintiff's medical reputation is unlikely to be tarnished by his removal from the on-call list. It affects only his treatment of patients who have never heard of him, and cannot be construed as any reflection on his abilities as a doctor.

The jurisdictional allegations of the complaint simply fail to set forth

> sufficient facts to support an 'interstate commerce' nexus to bring the case within the parameters of the Sherman Act. To the contrary, the gravamen of [plaintiff's] complaint was that defendants illegally excluded him from using a local facility [a few] times a month. This court cannot ascertain how such a deprivation has any more than a de minimis impact on interstate commerce.

*Stone, supra,* 782 F.2d at 614.

Moreover, even if plaintiff is regarded as having adequately pleaded the challenged conduct to be a conspiracy to fix prices, boycott and monopolize, his allegations as to interstate commerce are still insufficient to establish the required jurisdictional nexus. Amounts paid to the hospital by out-of-

state insurers and federal programs are calculated pursuant to state regulations that do not consider the fees charged by staff physicians. There is no factual support for the allegation that a scheme to fix prices for one emergency specialty by doctors at one community hospital would have an appreciable effect on amounts reimbursed by out of state carriers. Similarly, even if there existed a scheme to lower rates,[4] it is difficult to see how demand for emergency services could be altered, and therefore how the purchase of supplies could be affected. Moreover, in the absence of any even approximate allegation as to the percentage of patients referred from the emergency room or an amount of fees thereby generated, the Court cannot assess whether the impact on interstate commerce of the alleged price-fixing scheme would be significant.

Accordingly, the motions to dismiss are granted. Because I base this decision on the lack of subject-matter jurisdiction, I need not consider whether the suit is barred by the state action doctrine. In addition, because the federal claims have been dismissed, the pendent state claims for breach of contract and unfair competition are also hereby dismissed. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 725–26, 86 S.Ct. 1130, 1138–39, 16 L.Ed.2d 218 (1966); *Federman v. Empire Fire & Marine Ins. Co.,* 597 F.2d 798, 809 (2d Cir. 1979).

Dismissal here is in keeping with the policy that "[a]ntitrust suits like Dr. [Mamakos'], which are at best at the very margin of the Sherman Act's coverage, ought not to be initiated without some specificity concerning the jurisdictional facts readily within the plaintiff's knowledge." *Furlong, supra,* 710 F.2d at 927.

> [P]laintiffs are required to be more specific as to the facts of the interstate commerce nexus before [the Court] will compel defendants to engage in protract-

---

4. Because defendants are all specialists, plaintiff's theory that they desire to reduce specialists' fees to the benefit of general practitioners makes little "economic sense." *Matsushita Elec.*

*Indus. Co., Ltd. v. Zenith Radio Corp.,* —— U.S. ——, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

ed, expensive antitrust discovery. Failure to [dismiss] the instant complaint on the ground of lack of any allegations regarding a plausible nexus with interstate commerce would mean that virtually every physician who is ever temporarily denied hospital privileges for whatever reason could drag the hospital and members of its staff into costly antitrust litigation merely by alleging that the defendant receives payments, goods, or equipment in interstate commerce.

*Seglin, supra,* 769 F.2d at 1283–84 (footnote omitted).

### Conclusion

The antitrust claims are dismissed for lack of subject-matter jurisdiction. The pendent state claims are also dismissed.

SO ORDERED.